United States District Court
Southern District of Texas
**ENTERED**
April 26, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARVIN  WADDLETON III, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:15-CV-79 |
| | § | |
| BERNADETTE  RODRIGUEZ, *et al*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

In this prisoner civil rights action, Plaintiff Marvin Waddleton, III, alleges that Defendants, Officer Dacho Ongudu and Sergeant Aimee Salinas, used excessive force on October 4, 2012, causing him physical injuries for which he seeks compensatory and punitive damages.  (D.E. 1).  Defendants have filed a motion for summary judgment to dismiss this action on the grounds that they are entitled to qualified immunity.  (D.E. 24). Plaintiff has filed a cross-motion for summary judgment.  (D.E. 29).

For the reasons stated herein, it is respectfully recommended that the Court grant Defendants' motion for summary judgment, deny Plaintiff's motion for summary judgment, and dismiss Plaintiff's excessive force claims against Defendants with prejudice.

## I.    JURISDICTION.

The Court has federal question jurisdiction over this civil action pursuant to 28 U.S.C. § 1331.

## II.     PROCEDURAL BACKGROUND.

Plaintiff is a prisoner in the Texas Department of Criminal Justice, Criminal Institutions Division (TDCJ-CID), and is currently confined at the McConnell Unit (MCU) in Beeville, Texas.  He is serving a life sentence for aggravated assault of a public servant.

Plaintiff filed his original complaint on February 6, 2015, alleging that on October 4, 2012, certain MCU officers used excessive force against him while removing him from the law library and transferring him to prehearing segregation.  (D.E. 1).  In particular, he sued: (1) Lieutenant Bernadette Rodriguez; (2) Sergeant Aimee Salinas; (3) Officer Dacho Ongudu; and (4) Officer John Doe.  (D.E. 1, p. 3).

On February 18, 2015, a *Spears*[1] hearing was conducted, following which service was ordered on the four defendants identified above.  (D.E. 7)

Officer Ongudu and Sergeant Salinas each filed an answer to Plaintiff's complaint and raised the defense of qualified immunity.  (D.E. 10, 16).[2]

On September 10, 2015, Plaintiff filed a motion for leave to amend his complaint to add a retaliation claim against Ms. Candace Moore, the MCU law librarian, alleging that she had effectively caused the Use of Force (UOF) by illegally looking at Plaintiff's legal papers without his permission, then falsely accusing him of threatening her.  (D.E. 20).  Plaintiff's request to amend was denied.  (D.E. 21).

---

[1] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

[2] Since filing suit, Lieutenant Rodriguez has left the employment with the TDCJ-CID and efforts to serve her at her last known address were unsuccessful.  Similarly, the Attorney General was unable to identify Officer John Doe based on Plaintiff's description, and service was not effected on this individual.

On November 12, 2015, Defendants Ongudu and Salinas filed the instant motion for summary judgment.  (D.E. 24).

On December 18, 2015, Plaintiff filed a cross-motion for summary judgment, (D.E. 29), and on December 21, 2015, Defendants filed a reply to Plaintiff's summary judgment motion.  (D.E. 30).

Through this action, Plaintiff is seeking $300,000 in compensatory damages and one million dollars in punitive damages.  (D.E. 1, p. 4).

## III.   SUMMARY JUDGMENT EVIDENCE.

### A.   Defendants' Summary Judgment Evidence.

Defendants offer the following summary judgment evidence:

Ex. A: Use of Force Report (D.E. 24-1, pp. 1-67);

Ex. B: DVD video recording of October 4, 2012 UOF;

Ex. C: Plaintiff's medical records from 10/25/12 to 10/08/14, filed under seal (D.E. 25, pp. 2-14).

The summary judgment establishes the following:

### 1.   *The DVD Recording.*

On October 4, 2012, Plaintiff was in the law library working on his legal matters. The law librarian, Ms. Moore, and Plaintiff got into a dispute, and Ms. Moore called for assistance.  (D.E. 1, p. 4).  Lieutenant Rodriguez responded to the law library and told Plaintiff he must leave.  Ms. Moore then accused Plaintiff of threatening her. Lieutenant

Rodriguez responded by placing Plaintiff in handcuffs[3] and escorting him out of the library.  *Id.*   Plaintiff protested that he was not leaving without his legal papers; Lieutenant Rodriguez assured him that his papers would be returned to him.  Sergeant Salinas, and three other officers began walking with Plaintiff while one officer videotaped the event and Sergeant Rodriguez repeatedly instructed Plaintiff to not resist and to follow orders.  Sergeant Rodriguez advised Plaintiff he was going to 11 Building to be placed in segregation, at which time Plaintiff became angry stating that he had done nothing wrong and that Ms. Moore had falsely accused him of threatening her.  He kicked the door leading out of the library, cursed at the guards escorting him, and as they approached the hallway to 11 Building, he refused to enter and pushed back towards the officers.  Lieutenant Rodriguez advised him that failure to comply with her orders would result in a use of force.  Plaintiff continued to resist, and Sergeant Rodriguez ordered that Plaintiff be placed against the wall.  The officers pushed Plaintiff up to the wall, then lowered him to the ground.  Two other officers arrived and leg restraints were applied. Sergeant Salinas and another officer left; Officer Ongudu replaced an officer holding down Plaintiff's legs.  Lieutenant Rodriguez called for a gurney.  Plaintiff was lifted by the officers and placed on the gurney on his right side.  Plaintiff complained that the leg restraints were applied incorrectly and that one of his ankles had been cut and that he was bleeding.  The UOF team then continued transporting Plaintiff; however, once they reached the elevator Plaintiff informed the UOF team that he had a first row pass and had

---

[3] The DVD shows that Plaintiff was handcuffed with his arms in front of him.  Sergeant Salinas called and confirmed that Plaintiff had a front handcuff pass.

to remain on the bottom floor.  Lieutenant Rodriguez secured alternative housing in 11 Building, and Plaintiff was wheeled on the gurney to this location.  At his new cell, the UOF team lifted Plaintiff off the gurney while he was still shackled, and placed him on the ground, under the stationary bunk bed.  The leg restraints were removed and the officers exited.  Plaintiff was then ordered to place his arms through the food slot so that the hand restraints could be removed, but he refused to do so.  Lieutenant Rodriguez indicated on the video recording that she would return in fifteen minutes to remove the hand restraints if Plaintiff would comply.

### 2. *The Written UOF reports.*

The following officers were involved in the October 4, 2012 UOF:

| Name | Rank | Sex | Race | Age |
|---|---|---|---|---|
| Cuellar, Paul | Correctional Officer III | M | H | 25 |
| Martin, Yolanda, | Correctional Officer IV | F | H | 44 |
| Olufola, Olugbenga | Correctional Officer IV | M | B | 37 |
| Olutade, Taiwo | Correctional Officer II | M | B | 30 |
| Ongudu, Dacho | Correctional Officer | M | B | 54 |
| Rivera, Aurelio | Correctional Officer III | M | H | 23 |
| Rodriguez, Bernadette | Lieutenant | F | H | 25 |
| Sabatuea, Andriy, | Correctional Officer | M | W | 29 |
| Salinas, Aimee | Sergeant | F | H | 45 |
| Tidwell, Christopher | Correctional Officer II | M | W | 22 |

(D.E. 24-1, p. 62).

Written statements were given by each officer, and each officer was evaluated by medical following the UOF.  The following statements are relevant:

### a.  Lieutenant Rodriguez.

On October 4, 2012, Lieutenant Rodriguez completed the UOF Employee Participant Statement.  (D.E. 24-1, pp. 9-10).  According to her statement, after arriving at the library, Plaintiff refused to exit the library so Lieutenant Rodriguez called for additional staff and a video camera.  (D.E. 24-1, p. 10).  An officer arrived and applied hand restraints while Sergeant Salinas verified that Plaintiff had a front handcuff pass. (D.E. 24-1, p. 10).  One officer secured Plaintiff's right arm, Sergeant Salinas secured his left arm, and the escort proceeded outside.  (D.E. 24-1, p. 10).  At the 12 Building hallway, Plaintiff became belligerent, and Lieutenant Rodriguez ordered the UOF team to guide Plaintiff to the wall.  (D.E. 24-1, p. 10).  Plaintiff rapidly turned his back to the wall, and Sergeant Salinas grabbed his arm and pulled his left shoulder down, while another officer moved to Plaintiff's left side and pulled him down to the ground. Additional officers then arrived.  One officer applied leg restraints and Officer Ongudu held Plaintiff's legs down.  (D.E. 24-1, p. 10).  Plaintiff was then lifted onto a gurney and rolled onto his right side.  (D.E. 24-1, p. 11).  The upper body restraints were applied to keep Plaintiff on the gurney and Plaintiff was again advised to stop resisting.  (D.E. 24-1, p. 11).  The lower straps on the gurney were then applied.  After securing housing on the first floor in 11 building, the officers pushed the gurney to 49 cell.  Prior to entering the pod, Lieutenant Rodriguez took two photos of Plaintiff's injuries.  (D.E. 24-1, p. 11). Lieutenant Rodriguez instructed the officers to lift Plaintiff off the gurney and to carry him into the cell and then slide him under the bunk using the same holds. (D.E. 24-1, p. 11).   The leg restraints were removed and the officers exited the cell.   Lieutenant

Rodriguez ordered Plaintiff to relinquish the hand restraints through the food slot but he refused to comply.   (D.E. 24-1, p. 11).   After fifteen minutes, Lieutenant Rodriguez returned to Plaintiff's cell and gave him the order to relinquish the hand restraints, and he complied.   (D.E. 24-1, p. 11).   Officer Cuellar conducted a strip search and secured the tray slot.   (D.E. 24-1, p. 11).   Nurse Lanelle Roell conducted an onsite use of force physical noting no visible injuries, but Plaintiff complained of pain in both wrists and his left ankle.   Lieutenant Rodriguez took additional photographs of Plaintiff's cell door, and then terminated the UOF.   (D.E. 24-1, p. 11).

### b. *Sergeant Salinas.*

Sergeant Salinas gave a written UOF statement on October 4, 2012.   (D.E. 24-1, pp. 12-15).   Sergeant Salinas confirmed that Plaintiff became belligerent outside of the 12 Building hallway, and that Lieutenant Rodriguez ordered the escort team to guide Plaintiff to the wall.   (D.E. 24-1, p. 13).   As Plaintiff rapidly placed his back against the wall, Sergeant Salinas pulled plaintiff's right shoulder down while another officer, Officer Olufola, pushed Plaintiff's left shoulder down.   (D.E. 24-1, p. 13).   Lieutenant Rodriguez came over and placed both hands on Plaintiff's shoulders and pushed them down, while two other officers pulled Plaintiff's legs down, bringing him to the ground.   (D.E. 24-1, p. 13).   Another officer arrived on the scene and applied leg restraints.   (D.E. 24-1, p. 13).   While on the ground on his left side, Officer Ongudu arrived and began holding down his legs.   (D.E. 24-1, p. 13).   Sergeant Salinas left at this time and returned to her normal duties.   (D.E. 24-1, p. 13, 15).   Plaintiff was then placed on the gurney and secured.   (D.E. 24-1, p. 15).

### c. *Officer Dacho Ongudu.*

Officer Ongudu gave a statement on October 4, 2012.  (D.E. 24-1, pp. 23-25).

Officer Ongudu testified that, after Plaintiff was placed on the gurney, he held Plaintiff's

legs down during transport inside 12 Building, and then over to 11 Building and into the

cell.  (D.E. 24-1, p. 24).  After Plaintiff was lifted off the gurney and placed in the cell,

Officer Ongudu returned to his normal duties.  (D.E. 24-1, p. 24).

### d. *LVN Lanelle Roelle.*

On October 4, 2012, Plaintiff was seen cell-side by Lanelle Roell, LVN, for a

medical evaluation following the UOF.  (D.E. 24-1, pp. 60-61).  Nurse Roell found that

she was unable to screen Plaintiff for physical injuries because he was "a threat to staff"

at the time.  (D.E. 24-1, p. 60).  Nurse Roell noted that Plaintiff was ambulatory but

complaining of pain to both wrists and his left ankle.  (D.E. 24-1, p. 60).  She also noted

that Plaintiff was classified as "medically or mentally impaired prior to the UOF.  (D.E.

24-1, p. 6).  Under treatment, Nurse Roelle indicated: "No injuries due to UOF."  (D.E.

24-1, p. 61).  She noted that she observed no visual injuries.  (D.E. 24-1, p. 61).

### e. *Candace Moore.*

On October 4, 2012, Candace Moore submitted an offense report.  (D.E. 24-1, pp.

64).  Ms. Moore recounted the events as follows:

> Offender Waddleton, Martin, TDCJ No. 1355746, threatened to
> inflict harm on C. Moore in that said offender aggressively stated, (and
> after aggressively charging towards law library Officer Billy Garza), "You
> are next, you are outta here."  Due to said offender refusing orders to leave
> the law library and his aggressive and disruptive behavior, an ICS [Incident
> Command System] was initiated where a security supervisor, additional

staff, and a video camera operator responded.  The incident caused a significant disruption of operations in that such act caused delay in count during count times and a delay of access to courts for other offenders attending their scheduled law library session.

(D.E. 24-1, p. 64).

### f. Sergeant Quintero.

On October 4, 2012, Sergeant Quintero conducted a preliminary investigation of the UOF incident involving Plaintiff, including taking a statement from him.  (D.E. 24-1, pp. 66-67).  Plaintiff related that he did not care if he received a disciplinary case, but he wanted his legal property back.  (D.E. 24-1, pp. 66-67).

### B.   Additional medical evidence.

On October 25, 2012, Plaintiff was seen in the MCU infirmary complaining of injuries following the October 4, 2012 UOF.  (D.E. 25, pp. 11-12).  Plaintiff alleged that his right shoulder was injured, his back was sore, and that he had cuts and bruising to his ankle and wrists.  (D.E. 25, p. 11).  Plaintiff related that he had no previous injuries prior to the UOF, and now he had difficulty walking due to an ankle injury, as well as problems with numbness and tingling to his upper and lower extremities.  *Id.*  Upon examination, Physician's Assistant (PA) Eschvarry noted that Plaintiff had good strength to hands, with good opposition to both hands, vascular intact.  (D.E. 25, p. 12).  Plaintiff had mild neck pain with flexion and extension.  *Id.*  PA Eschvarry's assessment was shoulder pain with radiculopathy due to UOF.  *Id.*  The plan was to start Plaintiff on Nortriptyline for pain, as well as to continue him on his other medications, and for Plaintiff to seek follow-up care sooner if he did not improve.  *Id.*

On November 13, 2012, Plaintiff returned to the MCU infirmary complaining of pain in his hands and a weak grip. (D.E. 25, pp. 8-10). Upon examination, Dr. Whitt noted that Plaintiff was experiencing a muscle spasm to the right side of his neck. (D.E. 25, p. 8). He had mild tenderness to the right shoulder but full range of motion. *Id.* Plaintiff had neurological improvement in his grip strength bilaterally. *Id.* Plaintiff complained of loss of sensation in both index fingers. Id. Dr. Whitt's impression was subjective neuropathy affecting bilateral index fingers due to muscle spasms. *Id.* Dr. Whitt's plan was to prescribe Robaxin, a muscle relaxant, for seven days, increase Plaintiff's Nortriptyline for pain, continue Plaintiff on Ibuprofen, and schedule him for an x-ray of his spine and right shoulder. *Id.*

On March 10, 2013, Plaintiff reported to the MCU infirmary complaining of numbness in his legs that he claimed started in October 2012. (D.E. 25, p. 13-14). Nurse Jackie Nelson noted that Plaintiff had no neurological deficit and he did not complain of pain. (D.E. 25, p. 14). Her plan was to schedule Plaintiff to see a provider. *Id.*

On March 13, 2013, Plaintiff was seen by Dr. Whitt for his complaints of numbness and tingling outside of his feet following the October 2012 UOF. (D.E. 25, pp. 6-7). Upon examination, Dr. Whitt found areas of decreased sensation surrounded by hypersensitivity of lateral foot and ankle bilaterally, consistent with innervated superficial peroneal nerve. (D.E. 25, p. 6). Dr. Whitt's assessment was bilateral neuropathy of deep peroneal nerve, with some indication of slow recovery. (D.E. 25, p. 7). Dr. Whitt informed Plaintiff that recovery after injury is usually very slow, in terms of months and/or years, and that full recovery of the nerve was expected, but not guaranteed. (D.E.

25, p. 7).  Her plan was to increase Plaintiff's Nortriptylene to help with his symptoms. *Id.*

On October 8, 2014, Plaintiff reported to the MCU infirmary complaining of knots on his feet and ankles related to the October 2012 UOF, with numbness in his feet and ankles.  (D.E. 25, pp. 2-3).  He also complained of back pain and excessive gas.  *Id.* Upon examination, PA Susanna Corbett noted distended superficial bilateral veins and ankles and feet, but his pedal pulses were equal bilaterally.  *Id.* at 2.  Mild edema of his feet and ankles was noted.  *Id.*  PA Corbett's impression was distended varicose veins and her plan was to prescribe TED compression stockings.  *Id.* at 3.  In addition, she ordered a diuretic and instructed Plaintiff to keep his feet elevated when possible.  *Id.*  A lumbar x-ray was also ordered.  *Id.*

On April 19, 2013, Plaintiff reported to the MCU infirmary complaining, *inter alia,* that his wrists and feet hurt due to a UOF that occurred in October 2012.  (D.E. 25, pp. 4-5).  Upon examination, Nurse Shollenbarger found that Plaintiff's extremities were benign and he had full range of motion with no deformity.  (D.E. 25, p. 4).  Plaintiff was continued on Naproxen for pain.  *Id.*

### C.   Plaintiff's summary judgment evidence.

In his cross-motion for summary judgment (D.E. 29), Plaintiff alleges that the TDCJ CID has:

> A custom and practice of retaliation, harassment and Writing Disciplinary case against offenders that use Access to Court against TDCJ and often violating Court orders involving the case.

(D.E. 29, p. 1). He claims that, after filing a § 1983 action in 2010 complaining about unconstitutional disciplinary cases, he was retaliated against. (D.E. 29, pp. 1-2). Plaintiff filed Case No. 2:10-cv-267, *Waddleton v. Jackson, et al.,* on August 9, 2010, and sought leave to proceed *in forma pauperis*. (*Id.,* D.E. 1, D.E. 2). Magistrate Judge Owsley recommended that Plaintiff's motion to proceed i.f.p. be denied because his inmate trust fund account statement indicated that Plaintiff had $2,755.62 in his trust fund account at the time. (Case no. 2:10-cv-267, D.E. 6). The Court adopted the recommendation and Plaintiff paid the $350.00, an evidentiary hearing was held, and by memorandum entered November 10, 2010, it was recommended that Plaintiff's action challenging strip searches and his grievances related thereto be denied. (Case no. 2:10-cv-267, D.E. 20). On December 28, 2010, the Court adopted the recommendation and dismissed Plaintiff's lawsuit with prejudice. (Case no. 2:10-cv-267, D.E. 28, 29). On appeal, Case No. 11-40055, the Fifth Circuit upheld the searches as constitutional under the Eighth Amendment, but remanded the action for further findings under the Fourteenth Amendment. (Case No. 2:10-cv-267, D.E. 49). On remand, defendants were awarded summary judgment in their favor. (Case No. 2:10-cv-267, D.E. 79). Plaintiff appealed again, and on appeal, the Fifth Circuit affirmed the searches under the Fourteenth Amendment. (Case no. 2:10-cv-267, D.E. 123).

Plaintiff argues that the searches he challenged in Case No. 2:10-cv-267 are the cause for Ms. Moore's hostility toward him and the motivation for having him removed from the law library. However, even if so, those earlier searches have been litigated and

are now barred by *res judicata*, as well as time barred, and do not serve as competent summary judgment evidence.

## IV.   SUMMARY JUDGMENT STANDARD.

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion.  *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not weigh the evidence, or evaluate the credibility of witnesses.  *Id.*  Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions).   Unauthenticated and unverified

documents do not constitute proper summary judgment evidence. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." *Anderson*, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

## V.     DISCUSSION.

### A.     Eleventh Amendment immunity.

Plaintiff did not indicate whether he is suing Defendants in their official or individual capacities, so it is assumed that he is suing them in both.  He is seeking $300,000 in compensatory damages and 1,000,000 in punitive damages.  (D.E. 1, p. 4).

A suit against a state officer in his or her official capacity is effectively a suit against that state official's office.  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).  The Eleventh Amendment, however, bars claims for money damages against a state or state agency.  *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996); *Aguilar v. Texas Dep't of Criminal Justice,* 160 F.3d 1052, 1054 (5th Cir. 1998).  As such, an action for monetary damages against a state official in his or her official capacity is one against the state itself, and is barred by the Eleventh Amendment.  *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  The Fifth Circuit has extended the Eleventh Amendment immunity specifically to TDCJ-CID officers and officials acting in their official capacities.  *See Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002) (Eleventh Amendment bars prisoner's suit for money damages against prison officials in their official capacities).

Thus, to the extent Plaintiff is suing Defendants in their official capacities for money damages, those claims are barred by the Eleventh Amendment.  Accordingly, it is respectfully recommended that the Court dismiss those claims with prejudice as barred by the Eleventh Amendment and grant Defendants' summary judgment in their favor on those claims.

### B.   Excessive Use of Force.

Plaintiff is suing Sergeant Salinas and Officer Ongudu alleging that they used excessive force against him on October 4, 2012.

Claims of excessive force raised by convicted prisoners are evaluated under the Eighth Amendment's prohibition against cruel and unusual punishment. *See Kingsley v. Hendrickson,_____ U.S. _____, 135 S. Ct. 2466 (2015) (continuing to hold that excessive force claims for convicted prisoners are evaluated under the Eighth Amendment, while such claims for pretrial detainees are examined under the Fourteenth Amendment's Due Process Clause).

Inmates have a constitutional right to be free from the use of excessive force. *Anthony v. Martinez,* 185 Fed. Appx. 360, 363 (5th Cir. 2006).   To state a claim for excessive force, a prisoner-plaintiff must show that the force was not applied in a good-faith effort to maintain or restore discipline, but was applied maliciously and sadistically to cause harm, and that the injury he suffered was more than *de minimis,* but not necessarily significant.   *See Hudson v. McMillian,* 503 U.S. 1, 6, 10 (1992); *Gomez v. Chandler,* 163 F.3d 921, 923-24 (5th Cir. 1999); *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997).   The factors to be considered are (1) the extent of the injury suffered; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any effort made to temper the severity of a forceful response.   *Gomez,* 163 F.3d at 923.

In *Wilkins v. Gaddy*, 130 S. Ct. 1175 (2010) (per curiam), the Supreme Court ruled that a district court "erred in dismissing Wilkins' excessive force complaint based on the

supposedly *de minimis* nature of his injuries." *Id.* at 1180. The Court grounded this conclusion on the principle that "'the core judicial inquiry' [is] not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* at 1178 (citations omitted).

Although a *de minimis* injury is not cognizable, the extent of the injury necessary to satisfy the injury requirement "is directly related to the amount of force that is constitutionally permissible under the circumstances." *Ikerd v. Blair*, 1010 F.3d 430, 434-35 (5th Cir. 1996) (citations omitted); *see also Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004) (noting that the minimum qualifying injury "changes with the facts of each case"); *Williams v. Bramer,* 180 F.3d 699, 704 (5th Cir. 1999) ("What constitutes an injury in an excessive force claim is ... subjective -- it is defined entirely by the context in which the injury arises."). In general, the courts have concluded that the amount of injury necessary to satisfy the requirement of "some injury" and establish a constitutional violation is directly related to the amount of force that is constitutionally permissible under the circumstances. *Williams,* 180 F.3d at 703-04. Thus, courts may look to the seriousness of the injury to determine "whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley v. Albers,* 475 U.S. 312, 321 (1986).

In addition, Defendants have each raised the defense of qualified immunity, and therefore, the Court must also examine the actions of the Defendants individually in the

qualified immunity context. *Kitchen v. Dallas County, Tex.,* 759 F.3d 468, 478-79 (5th Cir. 2014). In claims brought under 42 U.S.C. § 1983, "when a defendant invokes the defense of qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." *See Brumfield v. Hollins,* 551 F.3d 322, 326 (5th Cir. 2008); *Bazen ex rel. Bazen v. Hildalgo Cnty,* 246 F.3d 481, 489 (5th Cir. 2001). Because qualified immunity constitutes an immunity from suit rather than a mere defense to liability, adjudication of a defendant's entitlement to qualified immunity "should occur 'at the earliest possible stage in litigation.'" *McClendon,* 305 F.3d at 323 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227 (1991). The two-part inquiry into qualified immunity is first "whether a constitutional right would have been violated on the facts alleged," and second "whether the right was clearly established" at the time of the violation. *Saucier v. Katz,* 533 U.S. 194, 200 (2001). Courts are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

There can be no claim of excessive force if there is no evidence to suggest that the force was administered maliciously and sadistically for the very purpose of causing harm. *Hudson,* 503 U.S. at 6. In this case, the UOF video recording negates any claim that the force employed by Defendants was applied maliciously or sadistically. Indeed, it shows clearly that the minimum amount of force was applied by all prison officials involved in an effort to maintain control and order of the situation.

The UOF video captures the entire event.  Throughout the video, Plaintiff uses profanity and exhibits bursts of anger toward the members of the UOF team.  At 21 seconds, Plaintiff uses profanity for the first time. (VR:00:21).  Sergeant Salinas and Officer Olufolat begin to escort Plaintiff out of the law library as Lieutenant Rodriguez narrates the events, and Plaintiff violently kicks open the door.  (VR:00:34).  Plaintiff's hands are restrained in front of him and Lieutenant Rodriguez notes that Sergeant Salinas has confirmed that Plaintiff has a front-cuff pass.  (VR:00:40).  Plaintiff is advised that he is charged with threatening Ms. Moore, and he objects to the charge, using profanity. (VR:00:41-VR:01:09).  While one arm is held by Officer Olufolat, Plaintiff speaks angrily at the video recording, and Sergeant Salinas enters and takes hold of his other arm to resume the escort to 11 Building.  (VR:01:13).  When told he is going to 11 Building, Plaintiff uses profanity. (VR:01:14-VR:01:41).

At VR:01:36, Plaintiff grabs a folder of his materials out of Officer Olufolat's hand.  At VR:01:40, Plaintiff is instructed to not resist, but he turns and uses profanity against Sergeant Salinas.  (VR:01:42).  At VR:01:59, Plaintiff states, "I'm really pissed off."   At VR:02:01, Plaintiff uses profanity and hesitates to enter the 11 Building hallway.  Just as they pass through the chain gate to the 11 Building hallway, Plaintiff pulls away from Sergeant Salinas, and Lieutenant Rodriguez orders Sergeant Salinas and Officer Olufolat to take Plaintiff to the ground.  Lieutenant Rodriguez assists the UOF officers, as does a new officer, Officer Yolanda Martin.  (VR:02:07-VR:02:25). During the incident, Lieutenant Rodriguez orders Plaintiff not to resist, but he continues to struggle and use profanity.  Lieutenant Rodriguez calls for back-up and for a medical

gurney.  At VR:03:37, Officer Aurelio Rivera arrives with leg restraints and applies them to Plaintiff's ankles.   At VR:4:33, the gurney arrives and Plaintiff is lifted onto the gurney.  (VR:05:32).   Plaintiff is agitated and cursing at the officers.   At VR:05:52, Plaintiff tells officers to "get off his leg."   Plaintiff is then placed on his right side and restrained.  At VR:06:28, Plaintiff is wheeled out of the area toward 11 Building elevator. Sergeant Salinas in no longer part of the UOF team.   Officer Ongudu is holding down Plaintiff's legs.   At VR:08:30, alternative housing must be found due to Plaintiff's first floor restriction.   At VR:09:52, Plaintiff screams that the cuff is being squeezed on his leg.  The recording shows that Officer Ongudu has his hands on Plaintiff's ankles, but he is not squeezing or leaning on Plaintiff's ankles.  At VR:12:20, the team begins escorting Plaintiff to 12 Building.  At VR:15:15, Lieutenant Rodriguez takes pictures of Plaintiff's injuries.  Plaintiff states to be sure to get a picture of his ankle because he believes it is cut.   At VR:18:40, Plaintiff is lifted from the gurney, placed in the cell, and the leg restraints removed.  At VR:19:20, Officer Ongudu exits the video.  Throughout the video, the TDCJ officers are calm, under control and professional.   The TDCJ officers' manner of dealing with this unfortunate situation, and recording the incident for subsequent review, resolves any doubt that their actions were restrained and reasonable under the circumstances.

The medical records support Plaintiff's claim that his ankles were sore and swollen after the UOF.  However, neither Sergeant Salinas nor Officer Ongudu was responsible for putting the leg restraints on Plaintiff.  Moreover, Plaintiff was placed in the leg restraints for no more than sixteen (16) minutes.  Even if the restraints had been

put on incorrectly or too tightly, he was not left in the restraints for any significant amount of time and his injuries were treated with anti-inflammatory and pain medication. (D.E. 25, pp. 11-12).  Although Plaintiff continued to identify the October 4, 2012 UOF as the cause for his ankle swelling and neuropathy, no medical provider identified the UOF as the cause for his persistent ankle pain.  In addition, prior to the UOF, Plaintiff already had a first floor pass as well as a front handcuff pass, suggesting previous degenerative disorders.

While it is true that Plaintiff's sworn pleadings are competent summary judgment evidence, the Fifth Circuit has held that a non-movant cannot satisfy his summary judgment burden with "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence."  *Hathaway v. Bazany,* 507 F.3d 312, 319 (5th Cir. 2007). Moreover, to state a claim of excessive force, Plaintiff must establish not only that Defendants' conduct caused more than a *de minimis* injury, but that it was done so sadistically or maliciously.  *Siglar,* 112 F.3d at 193.  As previously noted, the core judicial inquiry is not on the injury sustained, but whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically to cause harm. *Wilkins,* 559 U.S. at 38.  The October 4, 2012 UOF video shows nothing but restraint and professionalism with no visible attempt to injure Plaintiff.  To the contrary, in removing Plaintiff from the gurney, one officer calmly repeats; "gentle, gentle."

The objective factors of Plaintiff's medical records, combined with the UOF video recording demonstrate there was no excessive force in violation of Plaintiff's constitutional rights.

## VI.    RECOMMENDATION.

Based on the foregoing, it is respectfully recommended that the Court grant Defendants' motion for summary judgment (D.E. 24), deny Plaintiff's cross-motion for summary judgment, and dismiss Plaintiff's excessive claims against Sergeant Salinas and Officer Ongudu with prejudice.  It is respectfully recommended further that, based on the review of the UOF video recording, the Court find that Plaintiff cannot state an excessive force claim against any prison official who was involved in the October 4, 2012 UOF and that the unserved Defendants, Lieutenant Salinas and Officer John Doe, be dismissed with prejudice, and that final judgment be entered that Plaintiff take nothing on his claims.

Respectfully submitted this 26th day of April, 2016.

Jason B. Libby
United States Magistrate Judge

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996) (en banc).